IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 18, 2012 Session

**STATE OF TENNESSEE v. STEVEN D. PIPPIN**

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S58791     Robert H. Montgomery, Jr., Judge**

---

**No. E2012-00307-CCA-R3-CD - Filed December 10, 2012**

---

A Sullivan County jury convicted the Defendant, Steven D. Pippin, of aggravated sexual battery and incest. The trial court imposed a sentence of twenty years for the aggravated sexual battery conviction and a consecutive ten-year sentence for the incest conviction. On appeal, the Defendant argues that: (1) the evidence is insufficient to support his convictions; and (2) the trial court's sentence was excessive. After thoroughly reviewing the record and applicable authorities, we hold that the evidence is sufficient to sustain the Defendant's convictions and that the trial court properly sentenced the Defendant. Accordingly, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

William A. Kennedy, Blountville, Tennessee, for the appellant, Steven D. Pippin.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Barry Staubus, District Attorney General; and Teresa Nelson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's sexual contact with the four-year-old minor victim. A Sullivan County grand jury indicted the Defendant for rape of a child and incest. At the Defendant's trial on these charges, the parties presented the following evidence: The victim testified that, at the time of the trial, she was six years old and attended the first grade.

The victim said that the Defendant lived with her, her mother, and her brother in the "yellow house" where she presently lived. The victim recalled an occasion when the Defendant was alone with her in her bedroom and he put his penis in her mouth. The victim said that her mouth tasted "nasty" after the Defendant placed his penis in her mouth, so the Defendant gave her a banana popsicle.

The victim's mother, ("AP")[1], testified that she married the Defendant on September 5, 2008. AP and the Defendant lived together in a yellow trailer along with AP's son and daughter, the victim. In early November 2009, AP recalled putting her children to bed in their separate bedrooms and leaving for an hour or an hour and half while the Defendant remained at the trailer with the children. When AP returned, the victim was "acting very different." AP recalled that, when she entered the trailer, the Defendant was exiting the victim's room and "walked straight to the bathroom." The victim was not asleep, so AP put the victim "back to bed."

AP testified that the next morning before the Defendant left for work, AP arranged with the Defendant for him to pick up her children from AP's mother's house after work. AP described the victim's behavior as "clingy" throughout the day and, at some point, she talked with the victim about her behavior. Based upon this conversation with the victim, AP contacted the Sullivan County Sheriff's Department. AP took both her children to her mother's home. After his work shift ended, the Defendant arrived at AP's mother's home to pick up the children as they had agreed earlier in the day. AP told the Defendant that they "needed to have a talk." AP explained that she did not speak with him about her discussion with the victim at the time because her children were present. The Defendant left, and AP and the children spent the night at AP's mother's home.

AP testified that the following day, around noon, she returned to their trailer and found the Defendant's wedding band on the counter top and all of his belongings gone. AP said that she has not seen or spoken with the Defendant since that time.

On cross-examination, AP testified that, prior to this incident, she and the Defendant had been experiencing marital difficulty, which included "frequent fights," "yelling," and a "lot of tension." AP clarified that in January 2010 she did have contact with the Defendant in reference to filing their taxes.

Keith Proctor, a Tennessee Bureau of Investigation ("TBI") forensic scientist, testified that in December 2009 he performed a serology and DNA analysis in this case. Proctor examined a broom, a mop, the victim's nightgown, and a rug, all of which were recovered

---

[1] In order to protect the victim's privacy, we refer to the victim's mother by her initials only.

2

from the residence. Additionally, Proctor examined a sample of the Defendant's and victim's DNA. Proctor testified that he identified four possible stains on the rug. Testing confirmed the presence of limited spermatozoa in two of the stains. The first of the two stains had DNA from two contributors, the major contributor was the victim. The minor contributor was that of an unknown male individual. Proctor explained that he could not obtain a DNA profile on the minor contributor because there was insufficient DNA present. The other stain indicated that the major contributor was the victim and that the Defendant could not be excluded as a contributor. Proctor said that again the results were inconclusive due to insufficient or degraded DNA. On cross-examination, Proctor confirmed that he was unable to recover any samples from the broom, mop and nightgown submitted in this case.

Richard Kindle, a Sullivan County Sheriff's Department detective, testified that the initial report in this case was made on November 3, 2009, and he received the case on November 4, 2009. Detective Kindle said that he went to the victim's home and collected her nightgown, a rug from the victim's bedroom, a mop and a broom to submit to the TBI for analysis. The detective arranged to meet with the Defendant at the sheriff's department for an interview on November 13, 2009. The detective informed the Defendant of the allegations that the Defendant had sexually abused his step-daughter, the victim. The Defendant agreed to give a statement, and the detective wrote out what the Defendant stated, reviewed it with the Defendant, and then the Defendant signed the statement adopting it as his own. Detective Kindle read the Defendant's initial statement into the record as follows:

Me and [AP] met in April 2008. This is when we started dating. We got married September the 5th, 2008. Close to two weeks after we met she let me move in. She was living at Westridge Apartments. She had a daughter, [the victim] and son, JT, living with her. I didn't think too much about her having kids. I don't have any kids. I love kids. I would love to have one. After a few months of dating I would keep the kids two or three times a week. If she left to go to the store I would keep them. She hasn't worked since her daughter was born. They minded me pretty good. I had to whip them a few times. When JT got a little older I would whip him. [AP] was always there and gave me permission to do it. Sometimes they would mess with stuff they wasn't supposed to. I would use my hand and usually whip then [sic] on their legs between their butt or on their butt. I wouldn't whip them real hard. I never used anything but my hand. On Monday, November the 2nd I went to ABS and donated plasma. I think I got up there about 11 o'clock that morning. After I got done she wanted to go to Walmart [sic]. Everything was good between us. The kids were with us. We put a new comforter on the bed we got. I was off work that day. I'm off on Mondays most of the time. It was just normal hanging out, eating something. The kids were playing. As far [as]

3

I remember they were behaving. Somewhere between 9 and 10 [AP] left to one of her friend's. She was gone probably close to two hours. While she was gone I was sitting on the couch watching TV. The kids were in their beds. [AP] put [the victim] to bed before she left and I put JT to bed. They have separate bedrooms. They were in bed when [AP] left. I noticed [the victim] wasn't asleep about 20 minutes [later]. She came to the door and asked where mommy had went. I told her she went to Tammy's and would be back in a little while. I told her to go back and lay down. She shut her door. As far as I know she laid back down because I didn't hear nothing else from her. I went and checked on JT not too long after[] I asked her to lay back down. He was asleep. I just went and sat back down in the living room. I never did check on [the victim]. When [AP] got home she went and checked on her. She wasn't asleep because I could hear them both talking. She came and said [the victim] told her she was hungry. [AP] fixed [the victim] something. I was still sitting on the couch. I got up and went to the bathroom shortly after [AP] got home. I had to use the bathroom. Me and [AP] talked as normal. It was after [the victim] got done eating we went to bed. She was eating at the kitchen table. [AP] tried to put her to bed. [The victim] wanted to sleep in our bed until she fell asleep. [AP] turned the TV on and put her in [o]ur bed. I was sitting on the couch while she done this. She got up a couple of times. I heard something in our bedroom and [the victim was] playing with [AP]'s cell phone. I told her since she wasn't going to sleep to go ahead and lay back down in her bed. She got up and went back in there. Me and [AP] stayed up a little while watching TV and went on to bed. I had to be at work at 11 o'clock the next morning. All of them was asleep when I left. When I got off [work] I went to [AP's] mother's. [AP] had send [sic] me a text about one o'clock or one-twelve or something wanting me to pick the kids up there. She sent me another text telling me to call her. She was wanting to know if I could pick the kids up. She was at her mother's. When I got there she said she changed her mind about donating plasma. You could tell something was bothering her or on her mind. I thought it was where her and her stepmom had been arguing. When I asked what was wrong she said she had a lot on her mind. She never said a word to me about what was on her mind. I told her I was going home to change out of my work clothes and when she got home we would talk about it. I waited about two and a half hours and she never answered my calls. I left and went to see my mom and stepdad. She sent me a text about 11 o'clock that night but I didn't get to read until later. At that time I was going back to the trailer. The text asked me what I was doing. I sent one back asking why. She sent one saying she was wondering who was at our house. When I asked why she said "Just wondering." I haven't talked

4

to her since. I got my stuff out of the trailer early Wednesday morning, real early, about 2 or 3. We have had problems in the past and since she didn't answer my phone calls I just started packing my stuff. There has been other times we have argued and she has kicked me out.

Detective Kindle recalled that they then took a short break, after which he told the Defendant that he did not believe he was telling the truth and asked if the Defendant would give another statement. The Defendant agreed, and the detective wrote out a second statement following the same procedure of allowing the Defendant to review the statement and make changes and then sign it. Detective Kindle read the Defendant's second statement as follows:

It was probably four or five months ago I put my thing in [the victim's] mouth and pulled it right back out. I was keeping the kids. [AP] was gone. I don't remember, it was late in the night. [The victim] happened to wake up and came in there and asked where her mommy was. I told her she was gone and would be back in a little bit. I walked into her bedroom with her. I just pulled it out and asked her to put it in her mouth. She didn't say anything, she just opened her mouth. When I say my thing I mean my penis. I put it in her mouth and pulled it right back out. [The victim] didn't do anything or say anything. I put it back in my shorts and covered her up. She was standing up and I was standing in front of her. I did not get off. I left and went back and sat on the couch. [The victim] has never said anything about it. I don't remember taking any medication when this happened. This is the only time this has happened. I ain't ever touched her in a physical way. I ain't ever touched JT either.

The Defendant testified at trial on his own behalf that he never sexually abused the victim. He denied placing his penis in the victim's mouth and said that the first statement to the detective was true, but the second statement was false. The Defendant described his marriage in November 2009 as having "a little more problems." He said that he and [AP] talked of "breaking up." The Defendant explained that at the time of the interview he was "depressed" and "scared." He said that he "didn't really care any more." When the detective told the Defendant he was lying and "pretty much [told] [the Defendant] what was going on," the Defendant told the detective "what he wanted to hear." The Defendant said that he thought there was no hope and that he was going to jail, so he decided to give the false statement. On cross-examination, the Defendant admitted that he had prior convictions for breaking and entering and grand larceny.

5

Based upon this evidence, the jury convicted the Defendant of aggravated sexual battery, as a lesser-included offense of rape of a child, and incest.

At a subsequent sentencing hearing, the State submitted the presentence report prepared by the Board of Probation and Parole and a handwritten victim impact statement. The presentence report indicated that the Defendant had two convictions for breaking and entering, one conviction for grand larceny, one conviction for misdemeanor possession of marijuana and one conviction for misdemeanor failure to appear. The Defendant also had his probation revoked three times for one of his probationary sentences and revoked one time for another probationary sentence. Relying on the two previous convictions for breaking and entering, the trial court determined the Defendant to be a Range II, multiple offender. The trial court then sentenced the Defendant to twenty years for the aggravated sexual battery conviction and to a consecutive ten-year sentence for the incest conviction, for an effective sentence of thirty years in the Tennessee Department of Correction. It is from these judgments that the Defendant now appeals.

## II. Analysis
## A. Sufficiency of the Evidence

The Defendant argues that the evidence is insufficient to support his convictions. The State responds that the evidence supports the jury's verdict. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999)( (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### 1. Aggravated Sexual Battery

The jury convicted the Defendant of aggravated sexual battery. This requires proof beyond a reasonable doubt that: (1) the Defendant had "unlawful sexual contact," which the Code defines as the intentional touching of intimate parts with the purpose of sexual arousal or gratification, with the victim; and (2) that the victim be less than thirteen years of age. T.C.A. §§ 39-13-501(6), -504(a)(1)-(4) (2009).

After reviewing the evidence in the light most favorable to the State, we conclude that the evidence is sufficient to support the Defendant's conviction for aggravated sexual battery. In November 2009, AP left the four-year old victim and her son in the Defendant's care

while she went to a friend's house for an hour or more. Both children were already in bed in their separate bedrooms at the time AP left the trailer. At some point, the victim came out of her bedroom and inquired about the whereabouts of her mother. The Defendant told the victim her mother would be back shortly and then took the victim back to her bedroom. Once inside the victim's bedroom, the Defendant took his penis out of his shorts and placed his penis into the victim's mouth. The victim testified that her mouth tasted "nasty" after the Defendant removed his penis from her mouth, so the Defendant gave her a popsicle. A small amount of Spermatozoa was found on a rug in the victim's room. The DNA testing did not exclude the Defendant as a contributor to this sample.

This evidence is sufficient for a rational jury to find beyond a reasonable doubt that the Defendant placed his penis in the four-year old victim's mouth for the purpose of arousal or sexual gratification. Accordingly, we affirm the Defendant's conviction for aggravated sexual battery. The Defendant is not entitled to relief.

## 2. Incest

The Defendant was also convicted of incest. A conviction for incest requires proof that (1) the Defendant engaged in sexual penetration with the victim as defined by Tennessee Code Annotated section 39-13-501(7); (2) the Defendant knew that the victim was his or her natural parent, child, grandparent, grandchild, uncle, aunt, nephew, niece, stepparent, *stepchild*, adoptive parent, or adoptive child; and (3) the defendant acted intentionally, knowingly, or recklessly. T.C.A. §§ 39-15-302(a)(1) (2010); 39-11-301(c) (2009) (emphasis added). Tennessee Code Annotated section 39-13-501(7) defines "sexual penetration" as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body."

The evidence, reviewed in the light most favorable to the State, shows that the Defendant married the victim's mother and became the victim's stepfather in September 2008. The Defendant lived in the family home with the victim, her brother, and her mother, AP. The Defendant regularly watched the children while AP was away, and he was involved in the discipline of the children. In November 2009, AP went to a friend's house for an hour or more while the Defendant remained at the trailer with the children. Both children were already in bed in their separate bedrooms at the time AP left the trailer. At some point, the victim came out of her bedroom and inquired about the whereabouts of her mother. The Defendant told the victim that her mother was at "Tammy's" and would be back shortly. He then took the victim back to her bedroom. Once inside the victim's bedroom, the Defendant took his penis out of his shorts and placed his penis into the, then four-year old, victim's mouth. The victim testified that her mouth tasted "nasty" after the Defendant removed his penis from her mouth, so the Defendant gave her a popsicle. A small amount of

8

Spermatozoa was found on a rug in the victim's room. The DNA testing did not exclude the Defendant as a contributor to this sample.

This evidence is sufficient to support the jury's verdict that the Defendant engaged in sexual penetration of his stepdaughter when he placed his penis in the victim's mouth. Accordingly, we affirm the Defendant's conviction for incest. The Defendant is not entitled to relief as to this issue.

## B. Sentencing

The Defendant asserts that the trial court erred when it imposed the maximum sentence in the range and ordered his sentences to run consecutively. The State responds that the trial court properly sentenced the Defendant to serve thirty years in the Tennessee Department of Correction. We agree with the State.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). In 2005, the Tennessee General Assembly amended the sentencing law in order to bring Tennessee's sentencing scheme into compliance with United States Supreme Court rulings on the subject. *See United States v. Booker*, 543 U.S. 220 (2005); *Blakely v. Washington*, 542 U.S. 296 (2004).

Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors applied to the defendant's sentence. T.C.A. § 40-35-401(b)(2)(2004). The 2005 amendments, however, deleted, as grounds for appeal, a claim that the trial court did not properly weigh the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9. As a result, the appellate courts were "left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." *Carter*, 254 S.W.3d at 345-46.

Appellate review of sentences has been *de novo* with a presumption of correctness. In a recent decision, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions and announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Susan Renee Bise*, No. E2011-00005-SC-R11-CD, 2012 WL 4380564, at *19 (Tenn. Sept. 29, 2012).

9

A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *Shaffer*, 45 S.W.3d at 555 (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980).

The "presumption of reasonableness" now applied to sentences imposed by trial courts "'reflects the fact that, by the time an appeals court is considering a within-Guidelines sentence on review, *both* the sentencing judge and the Sentencing Commission will have reached the *same* conclusion as to the proper sentence in the particular case .'" *Bise*, 2012 WL 4380564, *15 (quoting *Rita v. United States*, 551 U.S. 338, 341 (2007)). A presumption of reasonableness "simply recognizes the real-world circumstance that when the judge's discretionary decision accords with the [Sentencing] Commission's view of the appropriate application of [sentencing purposes] in the mine run of cases, it is probable that the sentence is reasonable." *Rita*, 551 U.S. at 350-51.

### 1. Length of Sentence

The Defendant asserts that the trial court's sentence is excessive, arguing that he should have been sentenced to the minimum in the range. The State responds that the trial court properly considered enhancement factors that justify a maximum range sentence.

The trial court stated that it had considered both the evidence at trial and the sentencing hearing, had reviewed the presentence report and considered the principles of sentencing, arguments of the attorneys, applicable enhancement and mitigating factors, the Defendant's statement, statistics on sentencing practices and the specific circumstances of the criminal conduct involved in the case. The trial court found four enhancement factors applicable and one mitigating factor applicable. The enhancement factors are as follows:

(1)The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;

. . . .

(4) A victim of the offense was particularly vulnerable because of age or physical or mental disability;

. . . .

10

(8) The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community;

. . . .

(13) At the time the felony was committed, . . . the defendant . . . [was] released on probation.

T.C.A. § 40-35-114(1), (4), (8) and (13)(C). After the trial court explained why each enhancement factor applied, the trial court found applicable mitigating factor (1) that the "defendant's criminal conduct neither caused nor threatened serious bodily injury" but gave it "little weight." T.C.A. § 40-35-113(1).

Our review of the record reveals that the evidence supports the trial court's application of enhancement factors (1), (4), (8) and (13). Regarding enhancement factor (1) the trial court considered the Defendant's convictions for grand larceny, marijuana possession and failure to appear. We further note that the Defendant admitted to additional criminal behavior, the use of illegal drugs, which would also support the application of this factor. Regarding enhancement factor (4), that the victim was particularly vulnerable, the trial court found that because the victim was so young and dependent on the Defendant, it created a situation where the victim was "unable to resist the crime or summon help." In support of enhancement factor (8) that the Defendant previously failed to comply with release in the community, the trial court relied upon the Defendant's multiple revocations of previous probation sentences. Finally, in applying enhancement factor (13), the trial court found that the Defendant was on probation at the time he committed these felony offenses.

The Defendant does not argue that any of these factors are inapplicable agreeing that "the judge had the ability to increase the sentence . . . based on the enhancing factors." He asserts, however, that the trial court increased the sentence too much. As we earlier stated, this Court may not review the weight the trial court affords enhancement and mitigating factors. *See Carter*, 254 S.W.3d at 344. The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210, Sentencing Comm'n Cmts.

Accordingly, we hold that the trial court properly exercised its discretion in sentencing the Defendant to twenty years for his aggravated sexual battery conviction and to ten years for his incest conviction. The Defendant is not entitled to relief as to this issue.

11

## 2. Consecutive Sentencing

The Defendant challenges the trial court's imposition of consecutive sentencing based upon a finding that the Defendant had an extensive criminal history and the Defendant committed these offenses while on probation. The State responds that the trial court did not err in imposing consecutive sentences because the record supports the imposition of consecutive sentencing. We agree with the State.

Consecutive sentencing is a matter addressed to the sound discretion of the trial court. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A trial court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of the seven statutory factors exists. T.C.A. § 40-35-115(b)(1) - (7) (2010). In addition to these criteria, consecutive sentencing is subject to the general sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), -103(2) (2010); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

In this case, the trial court found the following consecutive sentencing criteria applicable:

(2)   The defendant is an offender whose record of criminal activity is extensive;

. . . .

(6)   The defendant is sentenced for an offense committed while on probation;

T.C.A. § 40-35-115 (2) and (6) (2010).

The Defendant attacks only the trial court's application of factor (2), asserting that his criminal record is not "extensive." The record shows that the Defendant was on probation at the time he committed the present offenses. As the State correctly notes, this factor alone would support the imposition of consecutive sentences. *See State v. Chrisman*, 885 S.W.2d 834, 839(Tenn. Crim. App. 1994) (holding that the existence of a single category is sufficient to warrant the imposition of consecutive sentences). We will review, however, the trial court's application of factor (2) in imposing consecutive sentences.

The trial court found that the Defendant's prior criminal activity was extensive. In reviewing the Defendant's criminal history, the trial court noted that the Defendant was

"relatively young" at the time of sentencing and his criminal convictions begin at age eighteen. The Defendant's convictions included two felony convictions for breaking and entering, a felony conviction for grand larceny, a conviction for misdemeanor possession of marijuana and misdemeanor failure to appear. In addition to those convictions, the Defendant had numerous traffic offenses on his record and several probation revocations. The trial court noted that the Defendant had been on probation, for the most part, since the age of nineteen.

We conclude that the evidence does not preponderate against the trial court's finding that the Defendant's record of criminal activity is extensive. Thus, the trial court did not abuse its discretion by ordering the Defendant's ten-year sentence to run consecutively to his twenty-year sentence. The Defendant is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE